**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**May 13, 2014**

# In the Court of Appeals of Georgia

A14A0719. THE STATE v. WALKER.

BOGGS, Judge.

The State appeals from the trial court's order granting James D. Walker a new trial on the basis of ineffective assistance of trial counsel. Under the applicable standard of review, the trial court did not clearly err in concluding that counsel's failure to investigate, interview, and present two exculpatory witnesses constituted ineffective assistance. We therefore affirm.[1]

> To succeed on his claim of ineffective assistance, [Walker] must satisfy both prongs of *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); that is, he must prove that his attorney's performance was deficient and that there is a reasonable probability that the result of his trial would have been different but for such deficiency;

---

[1]Walker raised other claims of ineffective assistance of counsel below, but the trial court did not rule on them as it found this claim to be dispositive.

in this Court's review of the trial court's decision regarding the alleged ineffectiveness, this Court is to accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but it is to independently apply the legal principles to the facts.

(Citations and punctuation omitted.) *Jackson v. State*, 316 Ga. App. 80, 82 (729 SE2d 404) (2012). "The trial judge, who oversaw the trial and heard the evidence presented at the hearing on the motion for new trial, makes the findings on whether the performance was deficient and whether it prejudiced the defendant, findings that this Court does not disturb unless clearly erroneous." (Citation and footnote omitted.) *Daguilar v. State*, 275 Ga. App. 756, 758 (2) (621 SE2 846) (2005).

Bearing these standards of review in mind, we note that Walker was tried in April 2012 and convicted of aggravated assault, false imprisonment, criminal trespass, and battery arising out of a 2010 encounter with the victim, a former girlfriend. The victim testified at trial that she lived with Walker for a time, but she moved out after having many arguments with him, some of which had "turned physical." She explained that she had moved in with her grandfather in his mobile home when Walker's sister called to warn her that Walker "had stole his mama's car and he was heading my way." She stated that she tried to flee, but Walker got to the home too quickly. He "jumped out of the car with the radio wide open, yelling and

being loud." She got the car keys away from Walker, called a friend to tell him where the car was, and went to the front of the house to wait. She testified that when Walker saw that police cars were arriving in response to the stolen vehicle call, he grabbed her, pulled her up under the home, hit her, choked her, "stomped [her] wrists," and threatened to kill her while "screaming and yelling."

The State presented four witnesses: the victim; Walker's sister, who telephoned the victim; the victim's grandfather, who testified that he heard loud voices and saw Walker push the victim and grab her arm; and a sheriff's deputy who returned to the scene some time later and located the victim and Walker under opposite ends of the mobile home. None of the witnesses other than the victim saw the acts complained of, although the deputy testified that the victim had a cut on her lip, swelling and "redness" on her face, and the victim's grandfather testified that she had "marks" on her face and neck. Walker did not testify, but his theory of defense was that he did not harm the victim and that she concealed herself under the home to avoid the police because she was on probation and admittedly had been using drugs that day.

In his motion for new trial, Walker alleged that his trial counsel was ineffective in failing to interview and present two exculpatory witnesses. At the hearing on the motion for new trial, Walker offered testimony from both these witnesses. The first

3

witness, the victim's cousin, testified that the victim knew that Walker was coming over to pick up a camera, that she was not upset and made no effort to leave, that she and Walker were chatting amicably until the police arrived the first time, whereupon Walker "took off running" and the victim remained with the witness. He testified that after he went back inside he did not hear any noise from under the home, that Walker did not touch the victim and that he would not have allowed him to do so, that there was no altercation, and that nothing happened until the police "pulled back up" and Walker and the victim both "ran up under the house." He testified that the victim appeared not to want to go to jail and that she "was fine until they pulled her up out from under the house and put the handcuffs on her . . . . that's when she started hollering oh, he beat me up, he beat me up." He observed that she had no injuries other than "a little scratch on her arm," which he believed was from the handcuffs. He also testified that he was familiar with the victim's reputation for truthfulness and that it was "pretty bad." He explained that she "makes up a lot of stuff . . . and says stuff that's not true."

The second witness, who had known the victim for 15 years, was also present at the home that evening. She saw the victim take a telephone call, after which she announced that Walker was on his way over but appeared "normal;" she did not

4

attempt to leave or ask the witness to take her anywhere. This witness was in the home directly over the crawlspace entrance, but she heard no yelling or arguing and heard nothing from underneath the home. She also observed the victim grabbing her own throat and making marks on herself while she was sitting in the back of the police car. This witness testified that the victim did not have a good reputation for truthfulness and that she would not believe her under oath.

The first witness testified that he wrote Walker a letter from jail, where he was confined from March to November of 2011. In the letter, he offered to testify on Walker's behalf because "[w]e both know [the victim] got scared and put marks on her self cause she was afraid she was going to jail to[o]." He testified that trial counsel never contacted him and that he never received a subpoena where he was living at the time of the trial. The second witness also testified that trial counsel never interviewed her.

Trial counsel testified that he interviewed Walker nine times between August 2011 and trial in April 2012, including in August, October, and November of 2011, while the first witness was in jail. He acknowledged that Walker did inform him of the existence of the first witness and showed him his letter, and that the information was "exculpatory" and "helpful" to the defense. He testified that he first attempted

5

to reach the witness by mailing him a subpoena on April 5, 2012, 13 days before trial. He later tried to reach him by telephone but "[j]ust never could reach him." The day or the week of trial, counsel attempted to locate the witness through his relatives, who said that he was "on the run." Trial counsel acknowledged that "if he had been, for example, in jail, I could have tried to get him that way." He also acknowledged that the second witness was identified in the State's discovery, but he had no recollection of talking to her or making contact with her; he did not know why he did not remember her, and he had no strategic reason for not investigating her. He agreed that her testimony that she saw the victim putting marks on herself "would have been helpful. That would have been nice to know."

The trial court found that "trial counsel was deficient in failing to properly investigate the case and by failing to present, or even, interview the two witnesses for the defendant . . . . Additionally, the Court finds that trial counsel's ineffective assistance as to this ground has raised a reasonable likelihood that the outcome of the trial would have been different." The court therefore ordered a new trial.

It is trial counsel's obligation to conduct a reasonable and thorough pretrial investigation, including locating and interviewing potential witnesses. *Tenorio v. State*, 261 Ga. App. 609, 612-613 (3) (583 SE2d 269) (2003); see also *State v. Lamb*,

287 Ga. App. 389, 391-392 (1), (2) (651 SE2d 504) (2007), overruled on other grounds, *O'Neal v. State*, 285 Ga. 361, 363 n.4 (677 SE2d 90) (2009). Here, "the record contains evidence supporting the trial court's conclusion that trial counsel did not adequately investigate the case or present a viable defense." (Citation and footnote omitted.) *State v. McMillon*, 283 Ga. App. 671, 672 (1) (642 SE2d 343) (2007), overruled in part on other grounds, *O'Neal*, supra.[2]

The State argues that the new witnesses are convicted felons, failed to make their testimony known to the sheriff's office or the district attorney, and contradicted each other in certain details, and that they are therefore unworthy of belief. But, as noted above, the construction of evidence and the credibility of witnesses are questions for the trial court, and, ultimately, for a jury. The State further argues that trial counsel made reasonable efforts to locate the witnesses and that Walker did not sufficiently assist him in doing so. But Walker presented evidence that trial counsel did not attempt to locate the second witness at all, and did not attempt to locate or interview the first witness until shortly before trial, when the information provided

---

[2]In *O'Neal*, our Supreme Court noted that the strict standard of review set forth in OCGA § 5-5-50 for the first grant of a new trial on the general grounds is inapplicable to the first grant of a new trial on special grounds involving a question of law. Id. at 362-363. That issue is not implicated here.

7

by Walker had become stale. See *Tenorio*, supra, 261 Ga. App. at 613 (3) (trial counsel, not defendant or his family, "ultimately responsible for ensuring a thorough investigation.") Compare *Ransom v. State*, 297 Ga. App. 902, 906-907 (2) (a) (678 SE2d 574) (2009) (affirming trial court's rejection of claim of ineffective assistance for failure to locate alibi witness; trial court authorized to believe trial counsel's testimony, to reject testimony of appellant's witnesses, and to conclude that counsel made reasonable efforts to locate witness.).

> In close cases, where the evidence presented by the state is thin, mistakes made by trial counsel take on greater significance. A verdict or conclusion only weakly supported by the record is more likely to have been affected by counsel's errors. Since the evidence against [Walker] was not overwhelming, resting largely upon the . . . testimony of one witness, a reasonable probability exists that the presence of the [exculpatory] evidence would have affected the result. The trial court did not err in concluding that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.

(Citations and punctuation omitted.) *State v. Crapp*, 317 Ga. App. 744, 748 (2) (732 SE2d 806) (2012) (failure to introduce available evidence corroborating defendant's account "supports a finding that counsel's performance was deficient.") Because the evidence supports the trial court's conclusion that trial counsel's performance was

8

deficient and that deficiency had a reasonable probability of affecting the outcome of Walker's trial, we find no error.

*Judgment affirmed. Barnes, P. J., and Branch, J., concur.*